IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRAY JIBRIL MURRAY, | : | |
|     Plaintiff, | : | 1:17-cv-0127 |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| SGT SMITHBOWER, *et al.*, | : | |
|     Defendants. | : | |

## MEMORANDUM

### March 23, 2021

Plaintiff, Bray Jibril Murray ("Murray"), a state inmate in the custody of the Pennsylvania Department of Corrections ("DOC"), formerly housed at the State Correctional Institution at Benner Township ("SCI-Benner"), Bellefonte, Pennsylvania, filed the instant action pursuant to 42 U.S.C. § 1983, on January 23, 2017, alleging that Defendants retaliated against him for filing a grievance asserting a violation of the Prison Rape Elimination Act ("PREA"), 42 U.S.C. § 15602. The governing pleading is Plaintiff's amended complaint (Doc. 8).

Remaining Defendants Smithbower, Stoner, Ellenberger, and Rossman have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 89). The motion is ripe for disposition. For the reasons set forth below, the motion will be granted.

I.   **<u>STANDARD OF REVIEW</u>**

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.*; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996).  Although the moving party must establish an absence of a genuine

2

issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." *Celotex*, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out ... that there is an absence of evidence to support the nonmoving party's claims." *Id.* at 325.

Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. FED. R. CIV. P. 56; *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Wooler v. Citizens Bank*, 274 F. App'x 177, 179 (3d Cir. 2008).  The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323; *see also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).  "[T]he non-moving party 'may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial.'" *Picozzi v. Haulderman*, 2011 WL 830331, *2 (M.D. Pa. 2011) (quoting FED. R. CIV. P. 56(e)(2)). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence

3

contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of North America. Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322. The adverse party must raise "more than a mere scintilla of evidence in its favor" and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989). The mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. *Anderson*, 477 U.S. at 249–50.

## II.  STATEMENT OF MATERIAL FACTS

On January 22, 2016, while leaving the library, Correctional Officer Myers ("Officer Myers") conducted a pat search of Murray. (Doc. 90, ¶ 10; Doc. 100 ¶ 10). On January 22, 2016, Murray filed Grievance 608919 with the heading "PREA violation" recounting the pat search and stating Officer Myers conducted the pat search in a way that made him feel uncomfortable and violated as he touched Murray's buttocks and "brushed down on [his] genital area." (Doc. 92-2, p. 2).

On March 1, 2016, upon returning from the yard to G Block where his cell was located, Murray encountered a locked door. (Doc. 90 ¶¶ 20, 21; Doc. 100, ¶¶ 20, 21). The door to G Block was locked so he began banging on the door and continued for five to ten minutes until the door was opened. (*Id.*; *Id.*). When the door was unlocked and he gained access, Smithbower and Stoner both appeared to be angry with him. (*Id*. at 22: *Id*. at 22). Smithbower reprimanded and berated Murray by calling him a crybaby and rat who files grievances about everything, referenced Officer Myers and the PREA, and threatened to have him put in the hole. (Doc. 100, ¶ 24; Doc. 99-2, p. 120, Declaration of Jayson Taylor, ¶ 11; Doc. 99-2, p. 48). Murray frequently utilized the grievance process. (Doc. 90, ¶ 18; Doc. 100 ¶ 18). Defendant Stoner did not make any such comments. (*Id.* at 24, 25; *Id.* at 24, 25). After the events, Murray requested a grievance form from Stoner and Stoner responded, "that'll probably be the last grievance you [sic] from off this block." )Doc. 99-2, p. 3, ¶ 12). That same day, Murray filed Grievance 616706, complaining of Defendants Smithbower and Stoner's conduct and calling for their termination. (Doc. 90, ¶ 26; Doc. 100, ¶ 26; Doc. 92-21; Doc. 99-2, p. 2).

On March 2, 2016, there was tension between Murray, Smithbower, and Stoner. (Doc. 99-2, p. 49). Usually, Murray, in his capacity as a tutor, and other block workers, are let out of their cells at 6:00 p.m. (Doc. 90, ¶ 19; Doc. 100 ¶ 19; Doc. 99-2, p. 50). All inmates are let out of their cells at around 6:15 p.m. for block activities. (Doc. 99-2, p. 50). Unbeknownst to Murray, at approximately 6:00 p.m.

5

that evening, there was an issue with the in-cell call system on G-Block. (Doc. 90, ¶ 29). At approximately 6:15 p.m. Defendant Stoner let Murray out of his cell to make a scheduled phone call. (Doc. 90, ¶ 33; Doc. 99-2, p. 3, ¶ 14). After his call, he questioned why no one else was outside their cell. (Doc. 90, ¶ 43; Doc. 100, ¶ 43). He approached Stoner and asked why he had to return to the cell. (*Id.* at 44; *Id.* at 44). Stoner instructed him to return to his cell. (*Id.* at 45; *Id.* at 45). Murray contends that he brought up the incident of the prior day with Stoner. (Doc. 90, ¶¶ 46, 47; Doc. 100, ¶¶ 46, 47, Doc.99-2, pp. 45-46). Smithbower appeared and confronted Murray as to why he was out of his cell. (Doc. 90, ¶ 48; Doc. 100, ¶ 48; Doc. 99-2, p. 3, ¶ 15). At this point, the parties' versions of events diverge.

Murray asserts that he responded that he is supposed to be out because he is a tutor. (Doc. 99-2, ¶ 15). Smithbower then called Murray names, referenced him filing grievances, and ordered him back into his cell. (Doc. 99-2, p. 3, ¶ 16). Two inmates witnessed this incident and declare that Smithbower referenced Murray's proclivity for filing grievances. (*Id*. at p. 121, ¶ 19; Doc. 102, ¶ 7). While in the process of retrieving his property from a nearby table, and before he was able to return to his cell, a response team of officers came into the unit. (*Id.*). He asserts that Smithbower told the Sergeant of the response team that he threatened Smithbower and Stoner. (*Id*. at p. 3, ¶ 17). He was taken to the Restricted Housing Unit ("RHU") where he received misconduct report #B781438.

6

Defendants contend that when Smithbower approached, Murray was yelling at Stoner. (Doc. 90, ¶ 34). When Smithbower asked what the problem was, Murray began yelling at him. (*Id.* at 35). Smithbower gave Murray six orders to return to his cell but he refused. (*Id.* at 36). Murray approached Smithbower and Stoner in an aggressive manner and Smithbower ordered Murray to back up and return to his cell. (*Id.* at 37, 38). Murray responded, "If I'm going to the RHU, I'll f***ing make it worth it" then began walking toward the officers and aggressively again yelled "I've got something for both of you f***ers." (*Id*. at 39). Smithbower notified main control and additional officers assisted with restraining Murray. (*Id.* at 40). While packing Murray's property for the RHU, Stoner found one wooden scrabble piece holder, a second razor, five pieces of stripped wire, one altered auxiliary cord, one handmade elastic bag, and one set of extra linen. (*Id.* at 41).

That same day, Defendant Smithbower issued misconduct #B781438 charging Murray with: (1) threatening an employee with bodily harm; (2) using abusive, obscene, or inappropriate language to an employee; (3) refusing to obey an order; (4) possession of contraband; and (5) presence in an unauthorized area. (Doc. 90, ¶ 62; Doc. 100, ¶ 62). The hearing initially convened on March 8, 2016, in front of Hearing Examiner Keri Cross. (*Id.* at 63; *Id*. at 63). Murray provided a written statement and requested a continuance of the hearing for purposes of viewing the CCTV video. (*Id.* at 63, 64; *Id*. at 63, 64). He also requested the

7

presence of two inmate witnesses. (Doc. 92-4, p. 7). Murray's request for a continuance of the hearing was granted. (*Id.* at 6).

The hearing reconvened on March 15, 2016, in front of Hearing Examiner Defendant Ellenberger. Murray's disruptive behavior resulted in his removal from the hearing and the inability to call witnesses. (Doc. 90, ¶¶ 66-71). Defendant Ellenberger considered Murray's written statement, Smithbower's written report and the CCTV video and set forth the following description of the events portrayed by the video:

> Inmate Murray can be seen on camera approaching the officer's desk in an aggressive manner. Staff can be seen pointing in the direction of his cell ordering him to go to his cell. Inmate Murray can be seen talking with his hands in what appears to be a hostile manner. Inmate Murray walks across the block towards the steps and turns around and says something back to the officers. He then walks up the stairs to his cell but did not enter his cell. After a few moments, Inmate Murray comes back down to the first level and is seen aggressively talking to staff. Additional staff arrive and Inmate Murray is escorted to the vestibule where he is eventually secured.

((Doc. 92-3, p. 183). Defendant Ellenberger concluded as follows:

> HEX believes the written report of CO2 Smithbower, over inmate Murray's denial and failure to comply with the hearing process, which inmate Murray was seen arguing with CO1 Stoner at the officer's desk. CO2 Smithbower asked Murray what the problem was and Murray began to yell at Smithbower. [He] was told to quit yelling and he walked toward CO2 Smithbower in an aggressive manner. Inmate Murray was then given 6 orders to lock in and he refused all orders. Inmate Murray then stated, "if I'm going to the RHU, I'll f***ing make it worth it" and then began walking towards the officer's desk aggressively then yelling "I've got something for both of you f***ers." CO2 Smithbower then notified main control of the situation. While

8

> packing Murray's property for the RHU, CO1 Stoner found (1) wooden scrabble piece holder, 1 second razor (single blade still present), (5) pieces of stripped wire, (1) altered auxiliary cord, (1) hand made [sic] elastic bag, and (1) set of extra linen. A preponderance of evidence exist[s] to support charges #15, #33, #35, #36, and #43.

(*Id*.). Murray received sanctions of 135 days of disciplinary confinement in the RHU and the loss of his tutoring position. (*Id.*). He appealed and the decision was upheld at all levels of appeal. (Doc. 90, ¶ 73; Doc. 100 ¶ 73).

On August 31, 2016, Murray was transferred to SCI Dallas. (Doc. 90, ¶ 80). He was released from disciplinary confinement on September 22, 2016. (Doc. 90, ¶ 78; Doc. 100, ¶ 78). He contends that, thereafter, Defendant Rossman, who, as the Corrections Classification and Program Manager ("CCPM"), is responsible for the administration and management of inmate employment and acts as the PREA compliance manager, denied him employment and compensation in retaliation for the filing of the PREA complaint and in violation of the DOC's Inmate Compensation Policy, DC-ADM 816. (*Id*. at 74-76, 81-82; *Id.* at 74-76, 81-82).

The Inmate Compensation policy provides that "An inmate who is removed from a work assignment shall immediately be eligible for General Labor Pool (GLP) compensation or a different work assignment." (*Id.* at 83; *Id.* at 83). "An inmate in Disciplinary Custody (DC) is generally not eligible for compensation unless the inmate is employed as a janitor on the Security Level 5 Housing Unit in accordance with Department policy 6.5.1, "Administration of Security Level 5 Housing Units." (*Id.* at 84; *Id.* at 84). "An inmate being released from DC is

eligible for GLP or a work assignment immediately upon release from a Security Level 5 Housing Unit. (*Id.* at 85; *Id.* at 85). Section 1 (D)(2) of the policy states: "An inmate receiving GLP compensation must maintain an acceptable level of personal hygiene and the cleanliness of his/her living area (including made bed), be available for work/school, accept responsibility for work in or around the housing unit, engage in any employment or school assignment offered, and comply with his/her Correctional Plan. An inmate who does not meet these requirements will forfeit GLP compensation until he/she is compliant, as determined by the Unit Management Team. (*Id.* at 86; *Id.* at 86).

Each year, an inmate and the inmate's counselor review the inmate's DC-43 Integrated Correctional Plan. (*Id.* at 88; *Id.* at 88). Murray's Correctional Plan includes outpatient programming. (*Id.* at 87; *Id*. at 87). There were conflicting entries concerning whether Murray had completed programming. (*Id.* at 89, 90, 93-95; *Id.* at 90, 93-95). After some research, which did not involve Defendant Rossman, it was determined that Murray was refusing programming and was not eligible for GLP while in general population. (Doc. 90, ¶¶ 92-96).

On October 3, 2016, Murray filed a grievance regarding GLP. (*Id.* at 97). In response to the grievance, staff at SCI Dallas responded that they met with him and he indicated that he was refusing programming and acknowledged that if he refused programming he would not be eligible for GLP. (*Id*. at 98). He ceased

refusing outpatient programming on October 11, 2016.  (*Id.* at 99).  The following day he began receiving GLP.  (*Id.* at 100).

## III.     DISCUSSION

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials.  *See* 42 U.S.C. § 1983.  The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

*Id.*; *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002); *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

The First Amendment offers protection for a wide variety of expressive activities.  *See* U.S. Const. amend I.  These rights are lessened, but not extinguished in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct.  *See Turner v. Safley*, 482 U.S. 78, 89 (1987).  Prison officials may be held liable for retaliatory conduct that was motivated "'in substantial part by a desire to punish [the prisoner]

11

for exercise of a constitutional right,'" *Allah v. Seiverling*, 229 F.3d 220, 224-25 (3d Cir. 2000) (citation omitted), such as filing lawsuits and grievances related to the conditions of incarceration. *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003). To succeed on his retaliation claim, Murray must demonstrate that he was engaged in constitutionally protected conduct, that prison officials caused him to suffer "adverse action," and that there is a causal connection between the exercise of his constitutional rights and the adverse action. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). With respect to the third element, "once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser*, 241 F.3d at 334. This is a "deferential standard" meant to take into account "that the task of prison administration is difficult, and that courts should afford deference to decisions made by prison officials, who possess the necessary expertise." *Id.*

    **A.**    **Defendants Smithbower and Stoner**

The filing of a grievance is an activity protected by the First Amendment. *See Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016) (*citing Mitchell*, 318 F.3d at 530); s*ee also Milhouse v. Carlson*, 652 F.2d 371, 373–74 (3d Cir. 1981) (finding retaliation for exercising right to petition for redress of grievances states a cause of action for damages arising under the constitution). Defendants concede

that Murray's filing of the grievance challenging Officer's Meyer's pat search constituted protected conduct. (Doc. 91, p. 6).

Once it is determined that the inmate was engaged in constitutionally protected conduct, he must show that he was subject to adverse action. To satisfy this prong, a plaintiff must demonstrate that he suffered "adverse" action "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." *Allah*, 229 F.3d at 225; *see also Bistrian v. Levi*, 696 F.3d 352, 376 (3d Cir. 2012). Defendants also concede that the issuance of Misconduct Report #B781438 constitutes adverse action as it carries with it more than *de minimis* consequences. (Doc. 91, p. 8, citing *Watson*, 834 F.3d at 417); *see also Rauser*, 241 F.3d at 333–342.

Next, the Court must determine whether there is a causal connection between the exercise of the constitutional right and the adverse action. The plaintiff must show that the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action. While causation can be established by direct or circumstantial evidence, "motivation is almost never subject to proof by direct evidence." *Watson*, 834 F.3d at 422. Motivation may be shown by "evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link." *Id.* " '[T]he timing of the alleged retaliatory action must be unusually suggestive of retaliatory

13

motive before a causal link will be inferred.' " *Id.* at 424 (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003)). "[C]ausation, like any other fact, can be established from the evidence gleaned from the record as a whole." *Id.* (citing *Farrell v. Planters Liefesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000) ). When showing causation through unusually suggestive timing, the contemplated temporal proximity must be "on the order of days or weeks." *Rink v. Northeastern Educ. Intermediate Unit*, 717 F. App'x 126, 134 (3d Cir. 2017) (citations omitted). "[W]here the temporal proximity is not so close as to be 'unduly suggestive,' the appropriate test is 'timing plus other evidence.' " *Watson*, 834 F.3d at 424 (quoting *Farrell*, 206 F.3d at 280).

Defendants Smithbower and Stoner argue that they were not substantially motivated by Murray's filing a grievance against another officer and that there is no temporal proximity between the January 2016 incident and the issuance of the misconduct in March. Defendants construe Murray's claim too narrowly. There is evidence that, in addition to referencing the PREA grievance, Smithbower berated Murray about filing grievances in general. Murray has satisfied the third prong.

If the prisoner establishes a *prima facie* case of retaliation, as is the case here, the burden then shifts to prison officials to show by a preponderance of the evidence that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser*, 241 F.3d at 334. In conducting this analysis, the Court must bear in mind

14

that the task of prison administrators and staff is difficult, and the decisions of prison officials require deference, particularly where prison security is concerned. *Id.*

When "evaluating the legitimacy of a misconduct report, [the Court] considers 'the quantum of evidence of the misconduct to determine whether the prison officials' decision to discipline an inmate for his violations of prison policy was within the broad discretion [the Court] must afford them.' " *Williams v. Folino*, 664 F. App'x. 114, 148-149 (3d Cir. 2016) (not precedential) (quoting *Watson*, 834 F.3d at 426). Where the prisoner is found guilty of the charges in a purportedly retaliatory misconduct report after a disciplinary hearing, the finding of guilt is considered strong evidence that the misconduct report was issued for a legitimate penological reason. *See Nifas v. Beard*, 374 F. App'x. 241, 244 (3d Cir. 2010) (not precedential); *Romansky v. Stickman*, 147 F. App'x. 310, 312 (3d Cir. 2005) (not precedential). A finding of guilt on a misconduct charge, combined with "a meaningful written statement of the evidence relied on and the reasons for the action taken," establishes a "quantum of evidence" of misconduct sufficient to warrant summary judgment. *Williams*, 664 F.App'x. 144, 148-49 (*quoting Watson*, 834 F.3d at 426; *Dyson v. Kocik*, 689 F.2d 466, 467 (3d Cir. 1982)). If the evidence supporting the disciplinary offense is "clear and overt," the Court should conclude that prison officials would have imposed the disciplinary measure

regardless of the inmate's protected activity. *See, e.g., Fennell v. Horvath*, 2020 WL 2556952, at *12-13 (E.D. Pa. May 20, 2020) (citing *Watson*, 834 F.3d at 426).

Defendants argue that, given Murray's conduct on March 2, 2016, they would have taken the same actions absent the protected conduct. (Doc. 91, pp. 10-11). At the disciplinary hearing, Defendant Ellenberger considered the misconduct report written by Defendant Smithbower and witnessed by Defendant Stoner, which stated that Murray refused to obey multiple orders, was present in an unauthorized area, and was harboring contraband in his cell. Defendant Ellenberger also had access to the CCTV video of the incident. The video captured Murray approaching the officer's desk in an aggressive manner, hand gesturing in a hostile manner, and aggressively speaking to officers. Based on all the evidence, Ellenberger found Murray guilty of the charged misconduct. The decision was upheld through all levels of appeal. Defendants have satisfied their burden in that they have come forward with a sufficient quantum of evidence of misconduct to demonstrate that the discipline imposed was reasonably related to a legitimate penological interest and that Murray would have been disciplined regardless of the filing of the PREA grievance and grievances in general. *See, e.g., Rivera v. McCoy*, 729 F. App'x 142, 145 (3d Cir. 2018). Defendants are entitled to an entry of summary judgment on the retaliation claim.

### B.  Defendant Ellenberger

Defendant Ellenberger is also entitled to an entry of summary judgment. Murray asserts that Defendant Ellenberger "is equally liable as defendants Smithbower and Stoner of violating plaintiff's First Amendment rights to use inmate grievance system to resolve PREA related grievances when he finds plaintiff guilty of fabricated and retaliatory misconduct; and consequently, terminates tutor job, and sanctions plaintiff to 135 days of disciplinary custody time in RHU." (Doc. 8, ¶ 17). Courts have consistently rejected retaliation claims "against one defendant based on [protected activity] against another [individual]" for lack of retaliatory motive. *Victor v. Lawler*, 2010 WL 5014555, at *5 (M.D. Pa. Dec. 3, 2010), *aff'd*, 565 F. App'x. 126 (3d Cir. 2014). *See also Evans v. Rozum*, 2009 WL 5064490, at *22 (W.D. Pa. Dec. 17, 2009) ("There is no apparent reason why [the moving defendants] would want to retaliate against Plaintiff for filing a lawsuit against others."); *Royster v. Beard*, 308 F. App'x. 576, 579 (3d Cir. 2009) (affirming summary judgment in favor of defendant on plaintiff's claim that he was retaliated against by a defendant who was not the target of his protected activity); *Horan v. Collins*, 2016 WL 5030468, at *6 (M.D. Pa. Aug. 8, 2016) (drawing no inference of causation where plaintiff's protected activity was not directed at any defendant).

Further, even had Murray established a *prima facie* case of retaliation, Defendant Ellenberger would be entitled to an entry of summary judgment based on the quantum of evidence in support of the misconduct discussed in detail above.

### C. Defendant Rossman

Murray also fails to meet his burden of establishing that Defendant Rossman denied him eligibility to secure prison employment in retaliation for filing a PREA complaint and grievances against staff. Specifically, he fails to adduce direct or circumstantial evidence that would establish a causal connection between the exercise of the constitutional right and the adverse action. (Doc. 8, ¶ 26). Nor does he demonstrate motive with either an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or a pattern of antagonism coupled with timing that suggests a causal link.

Additionally, as noted by Defendants, according to the record, the decisions concerning his GLP eligibility were made by his counselor and other prison staff, not by Defendant Rossman, and were related to his failure to comply with the GLP policy requirements concerning participation in programming.

Defendant Rossman is entitled to an entry of summary judgment.

### III. CONCLUSION

Based on the foregoing, the Court will grant Defendants' motion (Doc. 89) for summary judgment.

An appropriate Order will issue.